**VOICE–TEL ENTERPRISES, INC., et al., Plaintiffs,**

v.

**JOBA, INC., dba Voice–Tel of South Florida, et al., Defendants.**

**Civil Action No. 1:01–CV–3359–TWT.**

United States District Court,
N.D. Georgia,
Atlanta Division.

March 31, 2003.

Order Granting Reconsideration
in Part April 9, 2003.

Michael J. Gorby, Michael Singleton Reeves, Mary Donne Peters, James W. Standard, Jr., Gorby Reeves & Peters, Atlanta, GA, for Voice–Tel Enterprises, Inc., plaintiff.

Cary Ichter, Mark Gerald Trigg, Thomas Joshua Archer, Matthew B. Ames, Meadows Ichter & Bowers, Atlanta, GA, Jeremy E. Slusher, phv, Broad and Cassel, West Palm Beach, FL, for Joba, Inc. dba Voice–Tel of South Florida, Digital Communication Services, Inc. dba Voice–Tel of South Florida, defendants.

## ORDER

THRASH, District Judge.

This is an action for trademark dilution and breach of contract. It is before the Court on multiple Motions for Summary Judgment.

### I. BACKGROUND

Voice–Tel Enterprises, LLC, f/k/a Voice–Tel Enterprises, Inc. ("Voice–Tel") is a Delaware corporation having its principal place of business in Georgia. From 1986 to March 2002, Voice–Tel marketed and sold voice messaging products and services to end users throughout the nation. Voice–Tel itself designed, produced, marketed and sold voice messaging services under the Voice–Tel trademark from 1986 to March 2002. Until April, 1997, these services were provided to end users primarily through franchisees. Voice–Tel was the holder of the federally-registered trademark "Voice–Tel." (Master Appen-
dix of Exs., Ex. A, ¶ 4.) Through an assignment in March 2002, Voicecom Telecommunications, LLC now owns the "Voice–Tel" mark and is currently working to update the registration of the mark with the United States Patent and Trademark Office. (Master Appendix of Exs., Ex. A, ¶ 5.)

In the late 1980s, Voice–Tel attempted to build a nationwide system connecting all major cities to provide local access voice messaging. Voice–Tel relied on its franchisees to market, sell and service certain digital voice messaging services pursuant to its contracts with these franchisees from 1986 to March 2002. (Master Appendix of Exs., Ex. A, ¶ 7.) JOBA, Inc. ("JOBA") is a Florida corporation. In an agreement between Voice–Tel and JOBA dated December 13, 1989, JOBA became a Voice–Tel franchisee authorized to sell Voice–Tel's voice messaging systems. (Master Appendix of Exs., Ex. C.) Pursuant to this agreement, JOBA provides this voice messaging system in certain sales territories in South Florida. (Master Appendix of Exs., Ex. C, Art. III, ¶ A.) Voice–Tel granted JOBA limited rights to use the Voice–Tel trademark and trade name pursuant to the Franchise Agreement. The JOBA Agreement granted JOBA franchise rights for twenty years until December 13, 2009, with an option to extend the agreement for another ten years. Article I of the JOBA Agreement provides that Voice–Tel is the exclusive owner of, and has exclusive rights in, the "Voice–Tel" trademark, and that JOBA's right to the use of the "Voice–Tel" trademark exists only by virtue of the Franchise Agreement. In pertinent part, the Agreement provides that:

D. Franchisor is the owner of the entire right, title, and interest in the trade name, trademark, and service mark

"Voice–Tel," and other such service marks, trade names, and trademarks as are now designated herein (hereinafter referred to as "Proprietary Marks"), . . .

E. In connection with the development of this system, Franchisor franchises to others the right to operate businesses and franchises for the use of the service mark "Voice–Tel," and other trademarks, services marks, and rights residing in the design and appearance of signs and symbols as a symbol and name[.]

(Master Appendix of Exs., Ex. C, Art. I, ¶¶ D, E.) Article VII of the JOBA Agreement addresses the ownership and use of Voice–Tel's trademark:

A. USE OF NAME. Franchisor hereby grants to Franchisee, upon the terms and conditions herein contained, during the term hereof, the right to use and display Franchisor's Proprietary Marks, but only in connection with the operation and services granted by this Agreement. . . . Nothing herein shall give Franchisee any right, title, or interest in or to any of Franchisor's Proprietary Marks . . .

B. STANDARDS UNDER MARKS. Franchisee understands and acknowledges that each and every detail of Franchisor's system is important . . . in order to develop and maintain high and uniform standards of quality and service and hence to protect and enhance the reputation and goodwill of Franchisor. Franchisee accordingly agrees: 1. To use the Proprietary Marks only for the operation of the business franchised hereunder. . . . 2. To refrain from using any of the Proprietary Marks in conjunction with any other word or symbol without Franchisor's prior written consent. 3.

To use, promote, and offer for sale under the Proprietary Marks only those Voice–Tel services, which include digital voice communications and messaging services, merchandise and marketing techniques which meet Franchisor's prescribed standards and specifications. . . .

C. BUSINESS NAME. Franchisee agrees that the franchised business shall be named "Voice–Tel." . . . Upon expiration or sooner termination of this Agreement, or any extension or renewal thereof, Franchisor may, ifFranchisee does not do so, execute in Franchisee's name, on Franchisee's behalf, at Franchisor's sole expense, any and all documents necessary in Franchisor's sole and exclusive judgment to terminate and cause the discontinuance of Franchisee's use of Franchisor's Proprietary Marks. . . .

(Master Appendix of Exs., Ex. C, Art. VII, ¶¶ A, B, C.)

Digital Communication Services, Inc. ("Digital") is a Florida corporation. On November 15, 1993, Voice–Tel entered into a Franchise Agreement with Digital, wherein Digital became a franchisee of Voice–Tel authorized to sell Voice–Tel's voice communication and messaging systems. (Master Appendix of Exs., Ex. D.) Like JOBA, Digital provides services, and operates its franchise within certain sales territories, as set forth in the Digital Agreement. (Master Appendix of Exs., Ex. D, § 1.1 and § 1.4.) Voice–Tel granted Digital limited rights to use the Voice–Tel trademark and trade name pursuant to the Franchise Agreement. (Master Appendix of Exs., Ex. D, § 8.) The Digital Agreement granted Digital franchise rights for sixteen years until November 15, 2009 with an option to extend the agreement for another ten years.

The Digital Agreement provides that Voice–Tel is the owner of the "Voice–Tel" trademark, and that Digital's right to use this trademark exists only by virtue of the Franchise Agreement. That agreement provides that:

> WHEREAS, Franchisor, as the result of the expenditure of time, skill, effort, and money, has developed a distinctive digital voice messaging system ("the System") . . .

> WHEREAS, the System is identified by means of certain trade names, service marks, trademarks, . . . including but not limited to, the mark "Voice–Tel," as are now designated and may hereafter be designated by Franchisor in writing for use in connection with the System ("the Proprietary Marks");

> WHEREAS, Franchisor continues to develop, use, and control the use of the Proprietary Marks in order to identify for the public the source of the products and services marketed under the System, and to represent the System's high standards of quality and service;

> WHEREAS, Franchisee desires to enter into the business of operating a digital voice messaging service center under the System and using the Proprietary Marks, and wishes to enter into an agreement with Franchisor for that purpose. . . .

(Master Appendix of Exs., Ex. D, at 1.) Section 1.1 of the Digital Agreement provides that "Franchisor grants to Franchisee the rights, and Franchisee undertakes the obligations, upon the terms and conditions set forth in this agreement, to operate a digital voice messaging service center, and to use the Proprietary Marks and the System solely in connections therewith." (Master Appendix of Exs., Ex. D,

§ 1.1.) Section 8.2 of the Digital Agreement specifically addresses limitations on Digital's use of the "Voice–Tel" trademark. Specifically, this Section provides, in pertinent part:

> 8.2.1 Franchisee shall use only the Proprietary Marks designated by Franchisor, and shall use them only in a manner authorized and permitted by Franchisor;

> 8.2.2 Franchisee shall use the Proprietary Marks only for operation of the Franchised Business or in advertising for the Franchised Business;

> 8.2.3 Franchisee will use the Proprietary Marks only in accordance with the System and the standards and specifications attendant thereto which underlie the goodwill associated with and symbolized by the Proprietary Marks;

> 8.2.4 Unless otherwise authorized or required by Franchisor, Franchisee shall operate and advertise the Franchised Business only under the name "Voice–Tel,"

> . . .

> 8.2.6 Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of Franchisor's rights . . .

> 8.2.9 . . . If Franchisor, in its sole discretion, determines that Franchisee has not used the Proprietary Marks in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, shall be borne by Franchisor.

(Master Appendix of Exs., Ex. D.) Subsection 8.3 goes on to provide, in pertinent part, that "Franchisee expressly understands and acknowledges" the following:

8.3.1 Franchisor is the owner of all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them . . .

8.3.3 During the term of this Agreement and after its expiration or termination, Franchisee shall not directly or indirectly contest the validity of, nor take any other action which tends to jeopardize, Franchisor's ownership of, or right to use and to license others to use, the Proprietary Marks;

8.3.4 Franchisee's use of the Proprietary Marks pursuant to this Agreement does not give Franchisee any ownership interest or other interest in or to the Proprietary Marks;

8.3.5 Any and all goodwill arising under Franchisee's use of the Proprietary Marks under the System shall inure solely and exclusively to the benefit of Franchisor, and upon expiration or termination of this Agreement, no monetary amount shall be assigned as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks. . . .

(Master Appendix of Exs., Ex. D.)

The Defendants are separate corporations servicing different sales territories in South Florida and have entered into separate contracts with Voice–Tel. Mr. Barry Pinciss serves as the president of both corporations. (Master Appendix of Exs., Ex. C, at 41; Master Appendix of Exs., Ex. D, at 34). JOBA and Digital operate out of the same office and under the signage "Voice–Tel of South Florida" ("VTSF"). Defendants maintain that Digital is a separate corporate entity from JOBA that does business as "Voice–Tel of Miami" using its own checking accounts, operating accounts, and billing procedures. (Ilene Green Dep. at 70–72.)

The VTSF website contains the heading "Voice–Tel of South Florida," and advertises the voice messaging services that both JOBA and Digital offer in the South Florida region. (Master Appendix of Exs., Ex. J.) For instance, Miami–Dade county is within the exclusive franchise territory of Digital, and Broward and West Palm Beach counties are within the exclusive franchise territory of JOBA. (Master Appendix of Exs., Ex. D, § 1.) The "Voice–Tel of South Florida" website makes repeated reference to services and sales in the Florida counties of Miami–Dade, Broward, and West Palm Beach. (Master Appendix of Exs., Ex. J, ¶ 8.)

On the VTSF website, the e-mail addresses for the person in charge of sales, service and billing in the Miami territory, were all within the domain name "vtsf.com." (Master Appendix of Exs., Ex. J, ¶ 7.) Further, Digital advertised in the Miami business telephone listings and yellow-page listings. (Master Appendix of Exs., Ex. I, ¶ 17.) The numbers in these listings were the same as those advertised on the "Voice–Tel of South Florida" website. (Master Appendix of Exs., Ex. I, ¶ 17.) These numbers are answered with a greeting identifying the business contacted as "Voice–Tel of South Florida." (Master Appendix of Exs., Ex. I, ¶¶ 4, 17.)

The Director of Operations for JOBA and Digital, Mr. Emiliano Diego Brooks, testified that he personally registered the "vtsf.com" domain name. (Emiliano Brooks Dep. at 79.) Mr. Pinciss paid for the domain name. (Brooks Dep. at 79.) Mr. Brooks created the VTSF web page, and included on it several links to other businesses. (Brooks Dep. at 80.) These links included a link to Exchange–O–Mat-

ic, which is the subject matter of this lawsuit. (Brooks Dep. at 80.) Mr. Brooks took affirmative steps to put Exchange–O–Matic on the VTSF website. (Brooks Dep. at 80, 90.) The hyperlink, "Promoting Your Website Will Never Be Easier! Click Here", was initially hosted by a legitimate business entity. (Brooks Dep. at 84–85.) The entity went out of business, and control of the link was assumed by a different entity that distributed pornography and gambling materials. (Brooks Dep. at 127–28.) The hyperlink was deleted from the site in December 2001. (Brooks Dep. at 95.)

By the early 1990s, the Voice–Tel system included more than 100 franchisees. The Franchise Advisory Council ("FAC") was a group of franchisee elected representatives that negotiated with and advised Voice–Tel on issues affecting the system. (Chris Washko Dep. at 24.) In June 1991, all of the franchisees, including JOBA, entered into a "National Accounts Program Agreement" ("NAPA") with Voice–Tel. The National Accounts Program Cooperative ("NAPC") was a cooperative of all Voice–Tel franchisees and was organized to coordinate the selling efforts of the entire Voice–Tel system to large national accounts. (Barry Pinciss Aff. ¶ 4.)

Pursuant to the NAPA, a Board of Directors comprised of franchisee and Voice–Tel representatives agreed to "negotiate, approve, and administer national account contracts." (Defendants' Ex. F ¶ 2.) In turn, the franchisees, including JOBA, agreed to use "best efforts" to ensure that national accounts were properly serviced. (Pinciss Aff. ¶ 4.)

Voice–Tel franchisees typically paid 10% of revenues to Voice–Tel as franchise royalties. (William Welsh Dep. at 107–108.) The Service Representative Agreement ("SRA") provided, essentially, for a partial "rebate" for those royalties to franchisees who became Service Representatives. Only franchisees who purchased multiple territories were allowed to enter into SRA relationships with Voice–Tel. (Welsh Dep. at 108.) There is a Service Representative Agreement in effect between Voice–Tel and JOBA which requires Voice–Tel to rebate royalties generated from particular territories to JOBA in exchange for services provided by JOBA in these areas. Pursuant to this 1989 Agreement, JOBA became Voice–Tel's service representative in the central and south Florida territories, including, but not limited to, that area known by the parties as the "Orlando Territory." (Sean Dowd Aff. ¶¶ 13, 14, 17.) This agreement required JOBA to supervise the operations of Voice–Tel's franchise in the south and central Florida territories. (Master Appendix of Exs., Ex. L, at 2.) In exchange, Voice–Tel agreed to pay JOBA forty (40%) percent of the royalties received on gross revenues from the franchise operating within the relevant territory. (Master Appendix of Exs., Ex. L, at 3.)

By 1994, Voice–Tel was in significant disagreement with its franchisees on a number of critical issues pertaining to the franchise system. The four principal items of contention were: (1) matters pertaining to ownership and use of the Voice–Tel Network; (2) equipment sales and service matters; (3) matters pertaining to the SRAs; and (4) matters pertaining to the NAPC. (Washko Dep. at 33.) The parties endeavored to come up with a "global" solution to these issues. The phrase "Grand Solution" was coined to describe the negotiations and agreements reached by the parties with respect to these issues. (Washko Dep. at 33.) The Plaintiffs and the Defendants disagree as to when and, if

any, agreements were actually reached regarding these issues.

In April 1997, Voice–Tel was acquired by Premiere Technologies, Inc., k/n/a PTEK ("PTEK"). Also in April 1997, a corporate affiliate of PTEK bought all of the Voice–Tel franchises except for JOBA and Digital and merged them into Voice–Tel. After the 1997 mergers, the only remaining franchise territories were the JOBA and Digital territories located in Fort Lauderdale, Deerfield Beach and West Palm Beach. When the Orlando franchise was merged into Voice–Tel, Voice–Tel stopped receiving royalty payments from the Orlando territory because there was no longer a franchise operating in the Orlando territory. (Dowd Aff. ¶ 17.) Voice–Tel continues to collect royalty payments and make rebates for remaining franchised territories covered by the JOBA and Digital franchises. (Dowd Aff. ¶ 12.)

The Plaintiffs filed this action on December 10, 2001. It began as a fairly straightforward matter. The Plaintiffs alleged that JOBA and Digital were guilty of breaching the Franchise Agreements because their VTSF website had a link to another website containing hard core pornography and gambling materials. They sought a declaratory judgment that they were entitled to terminate the Franchise Agreements and sought equitable relief to enjoin the Defendants from using the Voice–Tel marks. From this simple beginning, both parties have proceeded with a dizzying escalation of claims and counterclaims until this litigation resembles a bottomless morass. In their Answer, the Defendants denied that they had violated the Franchise Agreements. They counterclaimed against the Plaintiffs alleging breach of the Franchise Agreements, the SRA, the Grand Solution and the NAPA. The Defendants also filed a third-party

complaint against PTEK and Premiere Communications, Inc. ("Premiere"), alleging that they were liable for tortious interference with business relations. Plaintiffs then filed a "counterclaim" against the Defendants asserting claims for breach of the Franchise Agreements and misuse of their proprietary marks. The Plaintiffs later filed an Amended Complaint asserting claims for breach of the Franchise Agreements, trademark tarnishment and dilution, and tortious interference with property. There are multiple Motions for Summary Judgment [Docs. 59, 60, 61, 92, 108, 109, 110] that are pending.

## II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. *DISCUSSION*

A. *Claims Related to the VTSF Website*

Plaintiffs moved for Partial Summary Judgment [Doc. 59] on issues related to

the trademark claims and defenses involving the VTSF website. Plaintiffs asked the Court to determine that the Defendants are jointly liable for tarnishment and misuse, to estop the Defendants from asserting the affirmative defense of abandonment of the Voice–Tel marks, and for a judgment as a matter of law as to Defendants' defense of inadvertence. Defendants filed a Cross Motion for Summary Judgment [Doc. 92] on Plaintiffs' claims for termination of the Franchise Agreements, trademark infringement under the Lanham Act and Plaintiffs' request for injunctive relief. If the Defendants are entitled to summary judgment, the Plaintiffs' motion is moot.

### 1. *Plaintiffs' Claim for Termination of the Franchise Agreements*

■ The Defendants filed a cross motion for summary judgment arguing that the Plaintiffs cannot terminate either Franchise Agreement based upon a third-party's independent action that did not materially impair the Plaintiffs' trade and service marks. The Defendants assert that the Franchise Agreements cannot be terminated absent a showing of intentional misconduct and resulting harm to Plaintiffs and the Defendants contend that Plaintiffs have not shown evidence of either. The Plaintiffs maintain that the agreements do not require intentional misuse of the marks to authorize termination, and that they are presumed to have suffered harm because of the nature of the injury.

The Franchise Agreements contain different language with respect to this claim. The Digital Franchise Agreement states that "[i]f Franchisee intentionally misuses or makes any unauthorized use of the proprietary marks or any other identifying

characteristics of the System, or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein" then Voice–Tel may terminate Digital's license. (Master Appendix of Exs., Ex. D, § 15.2.9.) The JOBA Agreement provides that the license may be terminated if there is "[f]ranchisee involvement in any act or conduct which materially impairs the goodwill associated with the Franchisor's Proprietary Marks or with any other marks of the Franchisor. . . ." (Master Appendix of Exs., Ex. C, Art. XIV(A)(22).)

■ The Franchise Agreements provide that they are to be construed according to Ohio law. Under Ohio law, the plain meaning of the contract terms govern the rights and duties of the parties to the contract. *Van Gunten v. Bankers Life & Cas. Company,* 21 Ohio Misc. 1, 251 N.E.2d 880, 883 (1969). The Court does not read the contract the way that the Defendants do with regards to the word "intentionally." While the word "intentionally" does appear in the Digital Agreement, it is in a series of clauses connected by the word "or," which means that Voice–Tel may terminate Digital's license if: (1) Digital intentionally misuses the Voice–Tel mark or makes any unauthorized use of the Voice–Tel mark, or (2) otherwise materially impairs the good will associated with the Voice–Tel mark. The word intentionally does not modify the entire paragraph. Further, the word "intentionally" does not even appear in the Franchise Agreement with JOBA. Therefore, in order to terminate the Franchise Agreement, the relevant phrase with regards to the facts of this case is that the Plaintiffs' mark must have been "materially impaired." The Defendants argue that Plaintiffs have not come forth with any evidence of material impairment. The Plaintiffs, however, ar-

gue that harm is presumed because of the association of the mark with pornography.

It is undisputed that the link to Exchange–O–Matic was a link to a legitimate website at the time that Defendants put the link on their VTSF website. When the owners of the legitimate site went out of business, it was taken over—at some unknown time—by the pornography distributor. There is no evidence that the Defendants were involved in or even knew that their website was linked to the pornography site. It is undisputed that the Defendants removed the link to the pornography site as soon as it was reported to them by Voice–Tel. Plaintiffs have not produced any evidence of actual impairment of their mark. There is no evidence that anyone on earth associates the Voice–Tel marks with pornography as a result of the hijacking of the Defendants' website.

Plaintiffs cite to the case of *Victoria's Cyber Secret Ltd. Partnership v. V Secret Catalogue, Inc.,* 161 F.Supp.2d 1339 (S.D.Fla.2001) for support of their position. In that case, plaintiff registered four domain names to be used as adult entertainment internet sites. The domain names were as follows: (1) victoriasexsecret.com; (2) victoriassexsecret.com; (3) victoriasexysecret.com; (4) victoriassexysecret.com. The court held that these domain names diluted the strong arbitrary trademark "Victoria's Secret" because it tarnished the mark due to the fact that the site would be used for "adult entertainment of a lascivious nature suitable only for adults." *Id.* at 1355. The court also stated that the use of a famous trademark in a domain name to purvey pornography constitutes dilution. *Id.*

This case is different. This case does not deal with domain names, but rather a hyperlink. That alone distinguishes the two cases factually. The Plaintiffs have not proffered any evidence that their mark has been materially impaired. For instance, they have not offered any consumer surveys or statistics that there was any harm whatsoever to the mark based on the link on the VTSF website. The Court could not find any tangible evidence that shows harm to the Plaintiffs' mark. Without putting forth any evidence, the Plaintiffs have not met their burden and have not shown that there is a genuine issue of fact as to material impairment. Thus, the Court holds that there is no genuine issue of material fact as to whether Voice–Tel's mark was materially impaired by Defendants. Therefore, Defendants' motion for summary judgment is granted as to whether the Franchise Agreements can be terminated based on material impairment of the mark.

### 2. *Plaintiffs' Lanham Act Claim*

 In this claim, the Plaintiffs allege that Defendants "wilfully intended to trade on Plaintiffs' reputation and/or cause dilution and tarnishment of Plaintiffs' registered trade mark." (Plaintiffs' Counterclaim, Count B and ¶ 9.) The elements of a dilution claim are that: (1) the plaintiff is the owner of a mark which qualifies as a "famous" mark, (2) the defendant is making commercial use, (3) in interstate commerce, (4) of a mark or trade name, and (5) defendant's use began after the plaintiff's mark became famous, and (6) defendant's use causes dilution by lessening the capacity of plaintiff's mark to identify and distinguish goods or services. *Bally Total Fitness Holding Corp. v. Faber,* 29 F.Supp.2d 1161, 1166 (1998). Dilution may be either by blurring or by tarnishment. *Id.* In this case, Plaintiffs argue that Defendants tarnished their mark by associating it with pornography.

Defendants assert that summary judgment should be granted as to this claim because of legal authority showing that as a matter of law, "tarnishment" does not exist when a website displaying one's trademark is linked to a second website, regardless of how offensive that second site might be. Defendants rely on two cases for this proposition. The first decision is *Bally Total Fitness Holding Corp. v. Faber*, 29 F.Supp.2d 1161 (C.D.Cal. 1998). In that case, Bally, a fitness company, sued the designer of a "Bally sucks" website dedicated to complaints about Bally. The "Bally Sucks" website was included within the www.compupix.com domain, which included a direct link to an "Images of Men" website that displayed and sold photos of nude men. Bally sued the website designer, claiming, among other things, that the proximity of the "Images of Men" site tarnished Bally's goodwill by improperly creating an association between Bally and pornography. The court rejected this claim.

The court rejected plaintiff's argument that the proximity of the defendant's "Images of Men" site tarnished the good will that Bally's mark enjoys because it "improperly creates an association between Bally's mark and pornography." The court held that if it accepted this argument "it would be an impossible task to determine dilution on the Internet." *Id.* at 1168. While there were links between the "Bally" trademark and the "Images of Men" site, "at no time was any pornographic material contained on defendant's 'Bally Sucks' site ... Looking beyond the 'Bally Sucks' site to other ... linked sites would, to an extent, include the Internet in its entirety." *Id.* The court further reasoned that:

The essence of the Internet is that sites are connected to facilitate access to information. Including linked sites as grounds for finding commercial use or dilution would extend the statute far beyond its intended purpose of protecting the trademark owners from use[s] that have the effect of "lessening ... the capacity of a famous mark to identify and distinguish goods or services."

*Id.*; 15 U.S.C. § 1127. Finally the court stated that it is not logical that a reasonably prudent Internet user would believe that sites which contain no reference to a trademark and which are linked to, or within the same domain as, a site that is clearly not sponsored by the trademark owner are in some way sponsored by the trademark owner. Accordingly, the court granted summary judgment as to Bally's trademark dilution claim. *Id.*

In creating a cause of action for dilution, Congress greatly expanded the scope of protection available to owners of famous trademarks. Federal Trademark Dilution Act of 1995, Pub.L.No. 104–98, codified at 15 U.S.C. § 1125(c). In an action under the Dilution Act, in contrast with a traditional infringement action, the owner of a qualified, famous mark may seek to enjoin junior users throughout commerce, regardless of the presence or absence of competition or confusion. *TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 95 (2d Cir.2001); 15 U.S.C. § 1127. The Court agrees that to extend a claim for dilution to a hyperlink situation would "extend the statute far beyond its intended purpose." The Court believes that to extend the protection of dilution to the facts of this case would give the trademark owner far more protection than what was intended by the statute. Thus, the Court grants Defendants' motion for summary judgment as to the Lanham Act claim.

3. *Plaintiffs' Claim for Injunctive Relief*

■ "A preliminary injunction is an extraordinary and drastic remedy not to be granted until the movant clearly carries the burden of persuasion as to the four prerequisites." *Northeastern Fla. Chapter of Ass'n of General Contractors of America v. Jacksonville, Fla.,* 896 F.2d 1283, 1285 (11th Cir.1990). In order to obtain a preliminary injunction, the movant must demonstrate "(1) a substantial likelihood that he will ultimately prevail on the merits; (2) that he will suffer irreparable injury unless the injunction issues; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest." *Zardui–Quintana v. Richard,* 768 F.2d 1213, 1216 (11th Cir.1985); *Gold Coast Publications, Inc. v. Corrigan,* 42 F.3d 1336, 1343 (11th Cir.1994). The Lanham Act authorizes injunctive relief in trademark dilution cases, "subject to the principles of equity and upon such terms as the court deems reasonable." 15 U.S.C. § 1125(c)(1). In this case, the Plaintiffs have requested an injunction to enjoin Defendants from further use of the "Voice–Tel" trademark.

■ Even if the Plaintiffs were entitled to recover on their Lanham Act dilution claim, the "Act demands that injunctive relief be no broader than necessary to cure the effects of the harm caused." *Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 750 (2d Cir.1994). "If warranted, the scope of the injunctive relief should be tailored to address the specific violations of law by the defendants." *Dunkin' Donuts v. Kashi Enterprises, Inc.,* 119 F.Supp.2d 1363, 1364 (N.D.Ga.2000). The Court holds that the scope of the relief sought by Plaintiffs is patently overbroad. Defendants removed the offensive link from the VTSF website immediately upon its discovery. At most, Defendants should be barred from "linking" the Voice–Tel trademark to adult materials, not from using the Voice–Tel trademark altogether.

The Plaintiffs claim the injunction is necessary because internet archive sites continue to allow users to link to the offensive third party site from the archived version of the VTSF site. However, the requested injunctive relief would have absolutely no effect on such archived websites because those sites are operated and maintained by third parties. These third parties would not be affected by the injunction. Thus, the relief requested would not cure the effects of the alleged harm. Even if the relief requested by Plaintiffs was not overly broad, as discussed by the Court above, the Plaintiffs cannot demonstrate a likelihood of success on the merits or irreparable injury. Thus, Plaintiffs' request for injunctive relief is denied and Defendants' motion for summary judgment is granted.

Defendants' Cross Motion for Summary Judgment [Doc. 92] on Plaintiffs' claims for termination of the Franchise Agreements, trademark infringement under the Lanham Act and Plaintiffs' request for injunctive relief is granted. As a result, Plaintiffs' Motion for Partial Summary Judgment [Doc. 60] is denied as moot.

B. *Defendants' Breach of Contract Claims*

In Plaintiffs' Motion for Partial Summary Judgment [Doc. 60], they seek summary judgment as to all of the Defendants

JOBA's breach of contract claims.[1] First, Plaintiffs assert that JOBA's claim that Voice–Tel breached the Franchise Service Representative Agreement fails as a matter of law because the franchise at issue no longer exists. Second, Plaintiffs contend that the claim that Voice–Tel breached the so-called "Grand Solution" fails as a matter of law because there was no definitive agreement. Finally, they contend that JOBA waived its breach of the Franchise Agreement claims by not asserting them for four years while accepting the benefits of the agreement during that time.

### 1. *Claims Under the Service Representative Agreement*

■ Count I of Defendants' Counterclaim and the Third–Party Complaint asserts that Voice–Tel breached the Franchise Service Representative Agreement ("SRA") for rebate of franchise fees from the Orlando Voice–Tel franchise. Specifically, JOBA alleges that Voice–Tel failed to "extend fees for services rendered by JOBA pursuant to the SRA." (Counterclaim ¶ 25(f)). This claim relates only to the former Orlando franchise territory.

The SRA entitled JOBA to a percentage of royalties that Voice–Tel received from the franchise operating in central and south Florida, including that area known as the "Orlando territory" in exchange for providing services in those areas. (Master Appendix of Exs., Ex. L, at 2.) It is undisputed that in 1997 Voice–Tel acquired the Orlando franchise and that there has been no "franchise" in Orlando and no royalties arising from that territory. (Dowd Aff. ¶ 17.)

Plaintiffs argue that JOBA has earned nothing from the Orlando territory pursuant to the SRA because since 1997 there have been no franchise operations to provide SRA services to in that territory. (Dowd Aff. ¶ 17.) In addition, Plaintiffs assert that the agreement on its face provides for the franchisee to provide certain services in order to receive a rebate. (Master Appendix of Exs., Ex. L, Art. VI.) Specifically, the SRA states that a "Service Representative shall provide supervision, support and training for all operational franchise businesses within the Territory according to the applicable franchise agreement and Operations Manual." (Master Appendix of Exs., Ex. L, Art. VI(c)(1).) In 1997, a corporate affiliate of PTEK bought the Orlando Voice–Tel franchise and merged it into Voice–Tel. (Patrick Jones Dep. at 138.) When the Orlando franchise was merged into Voice–Tel, it stopped receiving royalty payments from the Orlando territory because there was no longer an operational franchise business in the Orlando territory. (Master Appendix of Exs., Ex. D, ¶ 17.) Thus, Plaintiffs maintain that because there was no longer a royalty stream to Plaintiffs, they should be released from their obligation to pay the 40% of royalties to the Defendants.

Defendants argue that they are entitled to continue to collect that amount from Plaintiffs and that Plaintiffs' unilateral decision to eliminate the Orlando franchise was not fair and reasonable treatment of the Defendants. The JOBA SRA Agreement contains a provision that requires Plaintiffs to be fair and reasonable in their treatment of JOBA under the SRA:

> Whenever [Voice–Tel] is authorized to take unilateral action or other action based on the judgment or discretion of

---

1. Digital's non trademark breach of contract claims are subject to an arbitration agreement.

[Voice–Tel], without the necessity of a prior mutual agreement with Service Representative, [Voice–Tel] will only take such action as is fair and reasonable under the circumstances.

(Master Appendix of Exs., Ex. L, at 6.) The Defendants contend that they have been unfairly deprived of the benefit of the bargain they struck with Voice–Tel following their full satisfaction of the prerequisites to receiving those benefits.

The decision to acquire the Orlando franchise was not unilateral action taken by Voice–Tel pursuant to the SRA. It was a completely independent transaction. Therefore, Par. XI of the SRA does not apply and the plain language of the SRA governs Voice–Tel's liability for rebate of franchise fees. Even if it did apply, the Defendants have not shown how it could be unfair to terminate the payments when the Defendants' service responsibilities terminated. Accordingly, JOBA is entitled to summary judgment as to the Defendants' claim for breach of the SRA.

### 2. Defendants' Claims for Breach of the Grand Solution

■ As discussed in the background section, by 1994 Voice–Tel was in significant disagreement with its franchisees on a number of critical issues pertaining to the franchise system. The four principal items of contention were: (1) matters pertaining to ownership and use of the Voice–Tel Network; (2) equipment sales and service matters; (3) matters pertaining to the SRAs; and (4) matters pertaining to the NAPC. (Washko Dep. at 33.) The parties endeavored to come up with a "global" solution to these issues. The phrase "Grand Solution" was coined to describe the negotiations with respect to these issues. (Washko Dep. at 33.)

The Plaintiffs contend that although the franchisor and the franchisees negotiated with each other from 1994 to 1997 over the issues pertaining to the Grand Solution, they were never able to reduce the agreement to a writing because of major differences in language and funding. (Welsh Dep. at 116, 147–148). In fact, an agreement was not reached until 1997 after PTEK expressed an interest in buying the franchisor and some of the franchisees. (Welsh Dep. at 172.) Under the new Grand Solution, the franchisees agreed to release any claim to the voice messaging system; however, they would be granted an opportunity to sell many new services offered by PTEK's corporate affiliates, such as unified communications. (Welsh Dep. at 239, 244). Plaintiffs maintain that a final amended agreement was not reached until 1997. At that time, Voice–Tel reached a final amended agreement with all of the franchisees except for JOBA and Digital as to the issues encompassed by the new Grand Solution. (Master Appendix of Exs., Ex. M; Welsh Dep. at 242–245.) JOBA and Digital never signed the agreement with the franchisor regarding the new Grand Solution agreement. (Master Appendix of Exs., Ex. E; Welsh Dep. at 243–245.)

Defendants, on the other hand, assert that the parties endeavored to come up with a "global" solution to the four issues and the phrase "Grand Solution" was coined to describe the agreements reached by the parties with respect to these issues. In fact, Barry Pinciss, President of JOBA and Digital, has testified to his understanding that the Grand Solution was not one agreement, but a series of agreements. (Barry Pinciss Dep. at 223–24.) They further argue that the record shows that the material terms of the Grand Solution were agreed upon and implemented before the

PTEK acquisition. To support this claim, Defendants assert that a memorandum dated October 28, 1994, shows that Wayne Willis announced that the negotiating team would "drop out of the loop now ... since it appears that all critical issues [pertaining to the Grand Solution] have been resolved." (Defendants' Ex. R.) Further, the NAPC Board Minutes from March 1996 provide that the failure on the part of a franchisee to participate in the NAPC would result in "loss of value of the equity in the Voice–Tel Network which was negotiated in the Grand Solution." (Defendants' Ex. S at 9.) Finally, Defendants claim that relevant testimony establishes that the parties had an understanding with respect to the material terms of the Grand Solution. Mr. Alan Carter, one of the cofounders of Voice–Tel, confirmed that the understanding regarding mutual exclusivity was "in place until we sold the business." (Alan Carter Dep. at 125.) Messrs. Welsh and Washko confirmed that this was the case. (Washko Dep. at 49; Welsh Dep. at 94–95.) Mr. Carter also confirmed that an "oral commitment" was made to "give a 15% equity interest of the general partner to the franchisees[.]" (Carter Dep. at 145.)

■ Defendants have not met their burden of showing that there is a genuine issue of fact as to an enforceable written or oral agreement. It is undisputed that there was no written agreement between Voice–Tel and the Defendants on the issues addressed by the Grand Solution. The only written agreement was expressly rejected by Mr. Pinciss on behalf of the Defendants. The alleged oral agreements are unenforceable for two reasons. First, they are not sufficiently definite to be enforceable. "The various aspects of the alleged oral agreement were but potential terms to be embodied in new franchise agreements or potential changes which were predicated upon the signing of new franchise agreements. There was no oral agreement sufficiently definite for the Court to conclude that a valid and enforceable contract was entered into among the parties." *American Nursing Care of Toledo, Inc. v. Leisure,* 609 F.Supp. 419, 426 (D.C.Ohio 1984). Second, they are barred by the Statute of Frauds. *Sherman v. Haines,* 73 Ohio St.3d 125, 652 N.E.2d 698, 700 (1995). Defendants contend that they may escape the requirement of a written agreement due to partial performance. Even if the doctrine of partial performance applies in this case, Defendants may not rely upon partial performance of a contract that they expressly rejected. The Plaintiffs are entitled to summary judgment on the Defendants' claims for breach of the Global Solution. The only enforceable contracts between Plaintiffs and the Defendants are the Franchise Agreements and perhaps the NAPA.

### 3. *Waiver of Rights Under the Franchise Agreement*

■ JOBA claims that Voice–Tel has violated the Franchise Agreement in various ways, such as not allowing it to use the Voicecom name. Plaintiffs argue that JOBA waived all claims under the JOBA Agreement by continuing to operate as a franchisee. The Court disagrees with the Plaintiffs and holds that waiver is a matter for a jury. Under Ohio law, a "waiver is a voluntary relinquishment of a known right, with the intent to do so with the full knowledge of all the facts." *Bucher v. Schmidt,* 2002 WL 1773366, at *3, 2002 Ohio App. LEXIS 4064, at *8 (2002). "Equivocal or inconsistent conduct does not constitute waiver." *Id.* Whether a party waives its rights under a contract is a

question of fact to be determined by a jury. *See, e.g., Renfro v. Swift Eckrich, Inc.,* 53 F.3d 1460, 1464 (8th Cir.1995) ("Whether a party has waived its rights under a contract presents a question of fact") (*citing Ward v. Russell,* 32 Ark.App. 86, 796 S.W.2d 588, 589 (1990)); *Primm v. Wockner,* 56 Wash.2d 215, 351 P.2d 933, 935 (1960) (same); *Southern Colorado MRI, Ltd. v. Med–Alliance, Inc.,* 166 F.3d 1094 (10th Cir.1999) (same); *Northeast Drilling, Inc. v. Inner Space Services, Inc.,* 243 F.3d 25 (1st Cir.2001) (same). Moreover, the burden to prove waiver is a heavy one. *See Saydell v. Geppetto's Pizza & Ribs Franchise Sys., Inc.,* 100 Ohio App.3d 111, 652 N.E.2d 218, 226 (1994) (holding that party invoking waiver defense must demonstrate "clear, unequivocal, and decisive act of the party against whom the waiver was asserted"). Therefore, because "waiver" requires a showing by clear evidence and presents a question to be determined by a trier of fact and because Plaintiffs have cited to no legal authority to the contrary, summary judgment is improper on these grounds. Thus, Plaintiffs' motion for partial summary judgment on the waiver issue is denied.

### C. *Plaintiffs' Tortious Interference with Property Claim*

■ The Defendants move for summary judgment on the Plaintiffs' tortious interference with property claim. In this claim, the Plaintiffs contend that the Defendants have misused and damaged their trademark by linking it to the pornography site. To the extent that such a cause of action exists, the same elements of a claim for tortious interference with contract should apply.

To establish a cause of action for tortious interference with existing and prospective contractual relations, a claimant must show that the defendant: (1) acted improperly and without privilege, (2) purposely and with malice and intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury.

*Project Control Services, Inc. v. Reynolds,* 247 Ga.App. 889, 894, 545 S.E.2d 593 (2001); *see also Smith v. Ocean State Bank,* 335 So.2d 641, 643 (Fla.Ct.App. 1976). There is no evidence that the Defendants acted wilfully or maliciously to injure Plaintiffs' trademark. Therefore, summary judgment should be granted as to this claim.

### D. *Defendants' Claim for Tortious Interference*

■ The Defendants claim that the Third Party Defendants PTEK and Premiere are liable for tortious interference with business relationships. The Third Party Defendants have filed two Motions for Summary Judgment as to this claim. The contention that this claim is barred by the statute of limitations is without merit because the alleged interference with business relationships has continued from 1997 to the present.

The parties are in agreement that Florida law is controlling as to this claim.

The elements of tortious interference with a business relationship are (1) the existence of a business relationship ... (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.

*Ethan Allen, Inc. v. Georgetown Manor, Inc.,* 647 So.2d 812, 814 (Fla.1994). De-

fendants contend that PTEK and Premiere have interfered with their business relationships by not making available new communication technologies and by competing against the Defendants in their franchise territory. These claims are insufficient to constitute tortious interference with business relationships. Defendants have failed to show anything other than lawful competition in the market place for communication services. If actionable at all, this competition is actionable for breach of the Franchise Agreements. The Third Party Defendants' motions for summary judgment should be granted.

The Defendants rely upon the case of *Gossard v. Adia Services, Inc.*, 723 So.2d 182 (Fla.1998). That case involved a question certified from the United States Court of Appeals for the Eleventh Circuit. The question certified was as follows:

> Whether Florida law recognizes a claim for tortious interference against a corporation which purchases as a subsidiary a corporation which has a preexisting obligation not to compete against its franchisee, plaintiff herein, and subsequently purchases another subsidiary which is in direct competition with the franchisee?

*Id.* at 183. However, the Florida Supreme Court added this factual context for its answer to the certified question:

> Nursefinders and Gossard had an "agreement" that neither a parent nor affiliate of Nursefinders would provide similar health care services within Gossard's territory. Adia was aware of this "agreement" at the time it purchased Nursefinders. Adia then purchased Star–Med, a direct competitor of Gossard located in Gossard's territory. Consequently, Star–Med became Nursefinders' affiliate by virtue of their common parent, Adia. Therefore, by purchasing Star–Med, Adia knowingly caused Nursefinders to be in breach of its "promise" to Gossard that neither a parent nor affiliate of Nursefinders would provide similar health care services within Gossard's territory. Stated another way, because of Adia's purchase of Star–Med, Nursefinders had "no choice" but to be in violation of its franchise agreement with Gossard.

*Id.* at 184. Reaffirming its decision in *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812 (Fla.1994), the Florida Supreme Court answered the certified question in the affirmative.

After careful consideration, the Court concludes that there is a critical factual difference in this case that distinguishes it from *Gossard*. In this case, there was no agreement by Voice–Tel not to compete with JOBA or Digital. If the Court correctly understands how the Voice–Tel System worked, Voice–Tel and all of its franchisees competed for the so-called "National Accounts." They then shared revenues based upon the service bureau that actually provided messaging services to an end user. In the Franchise Agreements, Voice–Tel promised not to put another Voice–Tel franchise in the Defendants' territories. It did not promise that no affiliate would compete with the Defendants in the sense of offering services not provided by JOBA and Digital such as Voicecom's universal messaging services. Under the standard of *Ethan Allen* and the Restatement, such competition is not unlawful absent such a promise. Therefore, *Gossard* is not controlling authority here.

### E. Defendants' Claims Under the Collective Agreements

The Plaintiffs move for summary judgment with respect to the Defendants'

claims under the collective agreements among Voice–Tel and the franchisees. These agreements expired as a matter of law when Voice–Tel acquired all of its franchisees except for JOBA and Digital. *See Printing Industries Ass'n of Northern Ohio, Inc. v. Graphic Communications Union Local 56,* 584 F.Supp. 990, 1000 (D.C.Ohio 1984). Therefore, Plaintiffs are entitled to summary judgment with respect to these claims.

## IV. CONCLUSION

For the reasons set forth above, the Plaintiffs' Motion for Partial Summary Judgment on Trademark Issues and Issues Related to the VTSF Website [Doc. 59] is DENIED. The Plaintiffs' Motion for Partial Summary Judgment on Contract Issues [Doc. 60] is GRANTED IN PART AND DENIED IN PART. The Third Party Defendants' Motion for Summary Judgment [Doc. 61] and Second Motion for Summary Judgment [Doc. 110] are GRANTED. The Defendants' Motion for Summary Judgment on Tortious Interference with Property Claim [Doc. 108] is GRANTED. The Plaintiffs' Motion for Summary Judgment on Collective Franchise Agreements [Doc. 109] is GRANTED. The parties are directed to prepare a consolidated pre-trial order within 30 days from the docketing of this Order with respect to the remaining breach of the Franchise Agreement claims by the Plaintiffs and the Defendant JOBA.

## ORDER ON MOTION

This is a breach of contract action. It is before the Court on the Defendants' Motion for Reconsideration [Doc. 178] of the Court's Order granting in part and denying in part the Third Party Defendants' Motion to Compel Return of Privileged

Documents. The Motion for Reconsideration [Doc. 178] is granted in part and denied in part. Document Pinciss No. 007628 is not privileged because there was no accountant-client relationship and there was no accounting advice rendered in the communication. Therefore, the Motion to Compel is denied as to this document. Document Pinciss No. 00796–007964 is protected by the attorney-client privilege. The fact that it is a draft of a document that might later be distributed to third parties does not strip the document of its protection as attorney work product. Therefore, the Motion to Compel was properly granted as to this document. The Defendants' Motion for Reconsideration [Doc. 178] is GRANTED IN PART AND DENIED IN PART.