**BALLY TOTAL FITNESS HOLDING CORPORATION, Plaintiff,**

v.

**Andrew S. FABER, Defendant.**

**No. CV 98–1278 DDP (MANX).**

United States District Court,
C.D. California.

Dec. 21, 1998.

David Huebner, Glenn W. Trost, Coudert Bros., Los Angeles, CA, Eric E. Cohen, A. Sidney Katz, Eric C. Cohen, Welsh & Katz, Chicago, IL, for Plaintiff.

Kirk N. Sullivan, Gary Patrick Simonian, Jody Damon Angel, Hagenbaugh & Murphy, Glendale, CA, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PREGERSON, District Judge.

Andrew S. Faber's motion for summary judgment came before the Court for oral argument on November 23, 1998. After reviewing and considering the materials submitted by the parties and hearing oral argument, the Court GRANTS Faber's motion for summary judgment.

### BACKGROUND

Bally Total Fitness Holding Corp. ("Bally") brings this action for trademark infringement, unfair competition, and dilution against Andrew S. Faber ("Faber") in connection with Bally's federally registered trademarks and service marks in the terms "Bally," "Bally's Total Fitness," and "Bally Total Fitness," including the name and distinctive styles of these marks. Bally is suing Faber based on his use of Bally's marks in a web site he designed.

Faber calls his site "Bally sucks." The web site is dedicated to complaints about Bally's health club business. When the web site is accessed, the viewer is presented with Bally's mark with the word "sucks" printed across it. Immediately under this, the web site states "Bally Total Fitness Complaints! Un–Authorized."

Faber has several web sites in addition to the "Bally sucks" site. The domain[1] in which Faber has placed his web sites is "www.compupix.com." Faber's other web sites within "www.compupix.com" include the "Bally sucks" site (URL address "www.com-pupix.com/ballysucks"); "Images of Men," a web site displaying and selling photographs of nude males (URL address "www.compupix.com/index.html"); a web site containing information regarding the gay community (URL address "www.compupix.com/gay"); a web site containing photographs of flowers and landscapes (URL address "www.compupix.com/fl/index.html"); and a web site advertising "Drew Faber Web Site Services" (URL address "www.compupix.com/biz.htm").

On April 22, 1998, Bally applied for a temporary restraining order directing Faber to withdraw his web site from the Internet. Bally represents that when its application for a TRO was initially filed, the "Bally sucks" site contained a direct link to Faber's "Images of Men" site. In his opposition to the application for a TRO, Faber indicated that this link had been removed. The Court denied Bally's application on April 30, 1998.

Bally brought a motion for summary judgment on its claims of trademark infringement, trademark dilution, and unfair competition which the Court denied on October 20, 1998. In that order, the Court ordered Faber to bring a motion for summary judgment. This motion is now before the Court.

### DISCUSSION

### I. Faber's Motion for Summary Judgment

#### A. *Legal Standard*

Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477

---

1. "Domains" are used to provide organization to the Internet. The domain name is a word or series of words followed by ".edu" for education; ".org" for organizations; ".gov" for government entities; ".net" for networks; and ".com" as the catchall for other Internet users. Within each of these top level domains, there are many different sub-domains. An example of a domain name would be "www.Bally.com." Domain names are licensed to individuals by Network Solutions, Inc. Within any domain, the domain owner may place additional sub-domains and multiple web pages or may merely have one web site.

U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary judgment. *Id.* at 252, 106 S.Ct. 2505. In determining a motion for summary judgment, all reasonable inferences from the evidence must be drawn in favor of the non moving party. *Id.* at 242, 106 S.Ct. 2505.

### B. *Trademark Infringement*

The Lanham Act provides the basic protections that a trademark owner receives. To find that Faber has infringed Bally's marks the Court would have to find that Bally has valid protectable trademarks and that Faber's use creates a likelihood of confusion. 15 U.S.C. § 1114(1)(a). Faber asserts that Bally cannot meet this standard as a matter of law.

#### 1. *Validity of Bally's marks*

■ Bally has demonstrated that it has invested a substantial amount of money and effort to create valuable trademarks. Bally's marks are registered on the Principle Register of the U.S. Patent and Trademark Office. Additionally, Bally asserts that "[s]ince 1990, Bally has spent over $500,000,000.00 (one-half billion dollars) in advertising the Bally name in the health club industry." Further, "[i]n 1996, Bally spent over $5,000,000 in external signage for its clubs nationwide." Finally, Bally argues that it is the only business in the health club industry which uses the Bally marks. These facts establish that Bally has valid protectable marks.

#### 2. *Likelihood of confusion*

■ In determining whether a defendant's use of a plaintiff's trademarks creates a likelihood of confusion, the courts apply an eight-factor test, including:

(1) strength of the mark;

(2) proximity of the goods;

(3) similarity of the marks;

(4) evidence of actual confusion;

(5) marketing channels used;

(6) type of goods and the degree of care likely to be exercised by the purchaser;

(7) defendant's intent in selecting the mark; and

(8) likelihood of expansion of the product lines.

*See AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 348–49 (9th Cir.1979).

The *Sleekcraft* factors apply to related goods. *Id.* at 348. Bally is involved in the health club industry. Faber is an Internet web page designer who believes that Bally engages in unsatisfactory business practices. Faber operates a web site which is critical of Bally's operations. Bally, however, states that it uses the Internet to communicate with its members and to advertise its services. Consequently, Bally asserts that the parties have related goods because both parties use the Internet to communicate with current and potential Bally members.

"Related goods are those goods which, though not identical, are related in the minds of consumers." *Levi Strauss & Co. v. Blue Bell, Inc.,* 778 F.2d 1352, 1363 (9th Cir.1985). Several courts have addressed whether goods are related. *See id.* (shirts and pants are related goods); *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 152–53 (9th Cir.1963) (beer and whiskey are related goods); *Yale Elec. Corp. v. Robertson,* 26 F.2d 972 (2d Cir.1928) (locks and flashlights are related goods). The modern rule protects marks against "any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:6 at 24–13 (1997).

■ The Court finds that the goods here are not related. Web page design is a service based on computer literacy and design skills. This service is far removed from the business of managing health clubs. The fact that the parties both advertise their respective services on the Internet may be a factor tending to show confusion, but it does not make the goods related. The Internet is a communications medium. It is not itself a product or a service. Further, Faber's site states that it is "unauthorized" and contains the words "Bally sucks." No reasonable consumer comparing Bally's official web site with Faber's site would assume Faber's site

"to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." Therefore, Bally's claim for trademark infringement fails as a matter of law.

However, even assuming that these goods are related, Bally's claims also fail to satisfy the *Sleekcraft* factors.

### a. *Strength of mark*

This factor tips greatly toward Bally. Bally owns registered marks. Bally uses these marks extensively throughout the United States and Canada. Bally spends a significant amount of money each year to promote its marks. Finally, Bally asserts that no other company uses these marks in connection with health clubs, and that these marks are arbitrary. These facts demonstrate that Bally has strong marks.

### b. *Similarity of the marks*

Bally argues that the marks are identical. Bally argues that the only difference between the marks is that Faber attached the word "sucks" to Bally's marks. Bally argues that this is a minor difference.

"Sucks" has entered the vernacular as a word loaded with criticism. Faber has superimposed this word over Bally's mark. It is impossible to see Bally's mark without seeing the word "sucks." Therefore, the attachment cannot be considered a minor change. *See Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 202–03 (1st Cir.1996).

This factor cuts against Bally.

### c. *Competitive proximity of the goods*

Bally argues that the goods are in close proximity because both parties use the Internet. Bally uses the Internet to generate revenue and disseminate information to its customers in support of its health clubs. Faber uses his web site to criticize Bally and to provide others with a forum for expressing their opinions of Bally. Faber does not attempt to pass-off his site as Bally's site. Faber states that his site is "unauthorized." Bally asserts that its site offers similar services because it has a complaints section and it provides information about Bally's services and products.

The Court finds that Faber's site does not compete with Bally's site. It is true that both sites provide Internet users with the same service—information about Bally. These sites, however, have fundamentally different purposes. Bally's site is a commercial advertisement. Faber's site is a consumer commentary. Having such different purposes demonstrates that these sites are not proximately competitive.

Therefore, this factor cuts against Bally.

### d. *Evidence of actual confusion*

Bally does not offer evidence of actual confusion. Instead, Bally states, "consumer confusion is patently obvious in this case because of the strength of the Bally marks, combined with the obvious similarities in appearance and proximity of the marks, although there is no evidence of actual confusion."

Faber's states that his site is "unauthorized" and he has superimposed the word "sucks" over Bally's mark. The Court finds that the reasonably prudent user would not mistake Faber's site for Bally's official site.

Therefore, this factor cuts against Bally.

### e. *Marketing channels used*

Bally argues that both parties use the Internet to reach current and potential Bally members. Bally states that it uses the Internet to disseminate information and generate revenue. Bally contends that it has spent over $500,000,000 in advertisements including the Internet, television, radio, billboards and signage since 1990. Therefore, Bally has a broad marketing strategy which includes the Internet.

Bally has not shown that Faber uses all of these channels for marketing. Instead, Bally has shown that Faber has one site which offers his services for web design, and this site included a reference to his "Bally sucks" site for some time. However, this site no longer includes this link.

Arguably, listing the "Bally sucks" site as one of many sites Faber has created in order to advertise his web design services is a form of marketing. This fact, however, does not change the primary purpose of the "Bally sucks" site which is consumer commentary. Bally's goods and Faber's goods are not re-

lated. Therefore, the fact that marketing channels overlap is irrelevant.

This factor is, at best, neutral, and likely cuts against Bally.

### f. Degree of care likely to be exercised

Bally argues that individual users may mistakenly access Faber's site rather than the official Bally site. Bally argues that this may happen when users employ an Internet search engine to locate Bally's site. Bally argues that the search result may list Faber's site and Bally's site. The result, it argues, will be that "[p]rospective users of plaintiff's services who mistakenly access defendant's web site may fail to continue to search for plaintiff's own home page, due to anger, frustration or the belief that plaintiff's home page does not exist." (Bally's Mot. for Sum. Judg. 19:1–3, *quoting Panavision Int'l, L.P. v. Toeppen,* 141 F.3d 1316, 1327 (9th Cir.1998).) The *Panavision* case, however, concerned an individual who engaged in commercial use of plaintiff's registered mark in his Internet domain name, "Panavision.com." *See Panavision,* 141 F.3d at 1324.

Here, Faber uses the Bally mark in the context of consumer criticism. He does not use Bally in his domain name. He communicates that the site is unauthorized and that it is not Bally's official site. Moreover, Faber's use of the Bally mark does not significantly add to the large volume of information that the average user will have to sift through in performing an average Internet search. *See Teletech Customer Care Management (California), Inc. v. Tele–Tech Co.,* Inc., 977 F.Supp. 1407, 1410 (C.D.Cal.1997) (noting

that average search can result in 800 to 1000 "hits"). Whether the average user has to sift through 799 or 800 "hits" to find the official Bally site will not cause the frustration indicated in *Teletech* and *Panavision* because Faber is not using Bally's marks in the domain name. Moreover, even if Faber did use the mark as part of a larger domain name, such as "ballysucks.com", this would not necessarily be a violation as a matter of law.[2]

Further, the average Internet user may want to receive all the information available on Bally. The user may want to access the official Internet site to see how Bally sells itself. Likewise, the user may also want to be apprised of the opinions of others about Bally. This individual will be unable to locate sites containing outside commentary unless those sites include Bally's marks in the machine readable code[3] upon which search engines rely. Prohibiting Faber from using Bally's name in the machine readable code would effectively isolate him from all but the most savvy of Internet users.

Therefore, this factor cuts against Bally.

### g. Defendant's intent in selecting the mark

Here, Faber purposely chose to use Bally's mark to build a "web site that is 'dedicated to complaint, issues, problems, beefs, grievances, grumblings, accusations, and gripes with Bally Total Fitness health clubs.'" Faber, however, is exercising his right to publish critical commentary about Bally. He cannot do this without making reference to Bally.[4] In this regard, Professor McCarthy states:

---

**2.** The Court notes that there is a distinction between this example and cases like *Panavision* where an individual appropriates another's registered trademark as *its* domain name. In the "cybersquatter" cases like *Panavision,* there is a high likelihood of consumer confusion—reasonably prudent consumers would believe that the site using the appropriated name is the trademark owner's official site. Here, however, no reasonably prudent Internet user would believe that "Ballysucks.com" is the official Bally site or is sponsored by Bally.

**3.** The machine readable code is the hidden part of the Internet upon which search engines rely to find sites that contain content which the individual user wishes to locate. The basic mechanics is that the web page designer places certain keywords in an unreadable portion of the web

page that tells the search engines what is on a particular page.

**4.** Bally concedes that Faber has some right to use Bally's name as part of his consumer commentary. However, Bally argues that Faber uses more than is necessary when making his commentary and that he has alternative means of communication. Specifically, Bally argues that Faber could use the name "Bally" or "Bally Total Fitness" in block lettering without using Bally's stylized "B" mark or distinctive script. This argument, however, would create an artificial distinction that does not exist under trademark law. Trademarks are defined broadly to include both names and stylized renditions of those names or other symbols. 15 U.S.C. §§ 1051, 1127 (1997). Furthermore, the pur-

The main remedy of the trademark owner is not an injunction to suppress the message, but a rebuttal to the message. As Justice Brandeis long ago stated, "If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the process of education, the remedy to be applied is more speech, not enforced silence."

5 McCarthy, § 31:148 at 31–216.

Applying Bally's argument would extend trademark protection to eclipse First Amendment rights. The courts, however, have rejected this approach by holding that trademark rights may be limited by First Amendment concerns. *See L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26 (1st Cir.), *cert. denied*, 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987).

Therefore, this factor is neutral.

### h. *Likelihood of expansion of the product line*

Bally essentially concedes that there is no likelihood that Bally will expand its product lines into the same areas in which Faber operates. However, Bally claims that Faber's intentional acts reduce the significance of this factor. Bally, though, relies on conclusions rejected by the Court. (*See supra* Part I–B–2–g.)

It is apparent that the parties will not expand into the other's line of business. Bally intends to use the Internet as a means of increased communication. However, Bally has not represented that it intends to enter the web design business or that it intends to operate an official anti-Bally site. Further, Faber has not indicated that he intends to operate a health club.

Therefore, this factor also cuts against Bally.

### 3. *Conclusion*

Bally owns valuable marks. However, Faber has established that there is no likelihood of confusion as a matter of law. Therefore, the Court grants Faber's motion for summary judgment on trademark infringement.

### C. *Trademark Dilution*

■ The elements of a dilution claim are that:

(1) The plaintiff is the owner of a mark which qualifies as a "famous" mark as measured by the totality of the eight factors listed in § 43(c)(1),·

(2) The defendant is making commercial use,

(3) In interstate commerce,

(4) Of a mark or trade name,

(5) And defendant's use began after the plaintiff's mark became famous,

(6) And defendant's use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.

3 McCarthy, § 24:89 at 24–137–38 (footnote omitted). Dilution may be either by blurring or by tarnishment. *See Id.* §§ 24:69, 24:68, at 24–116–17. Here, Bally argues that Faber has tarnished its mark by associating it with pornography.

Commercial use is an essential element of any dilution claim. Here, Bally argues that Faber has used Bally's mark to demonstrate his skills as a web site designer and to show current members how to effectively cancel their memberships with Bally. Bally asserts that Faber listed the "Bally sucks" web site on the "Drew Faber Web Site Services" site in an effort to advertise Faber's services.

■ Bally cites several "cybersquatting" cases in which individuals registered the trademarks of others as domain names for the purpose of selling or ransoming the domain name to the trademark owner. Bally asserts that these cases hold that using another's mark on the Internet is per se commercial use. The mere use of another's name on the Internet, however, is not per se commercial use. *See* 3 McCarthy, § 24:97.2 at 24–172.

Here, Faber used Bally's marks in connection with a site devoted to consumer product review of Bally's services. In congressional hearings, Senator Orrin Hatch stated that

---

pose of a trademark is to identify the source of goods. *Id.* § 1127. An individual who wishes to engage in consumer commentary must have the

full range of marks that the trademark owner has to identify the trademark owner as the object of the criticism. (*See infra* Part I–C.)

the dilution statute "will not prohibit or threaten noncommercial expression, such as parody, satire, editorial and other forms of expression that are not a part of a commercial transaction." 141 Cong.Rec. S19306–10 (Daily ed. Dec. 29, 1995). Therefore, this exception encompasses both parodies and consumer product reviews. *See Panavision Int'l, L.P. v. Toeppen,* 945 F.Supp. 1296, 1303 (C.D.Cal.1996).

█ Faber has shown that Bally cannot demonstrate that he is using Bally's mark in commerce. Bally argues that Faber's listing of the "Bally sucks" site, among others, in a site listing his available services and qualifications uses the Bally mark to promote a service. This argument is unpersuasive. Faber is not using the Bally mark to sell his services. Faber is not using Bally's mark to identify his goods in commerce. Faber merely listed the "Bally sucks" site as one of several web sites that he has designed so that those who are interested in his services may view his work. This is akin to an on-line resume.

Further, the courts have held that trademark owners may not quash unauthorized use of the mark by a person expressing a point of view. *See L.L. Bean,* 811 F.2d at 29, *citing Lucasfilm Ltd. v. High Frontier,* 622 F.Supp. 931, 933–35 (D.D.C.1985). This is so even if the opinion may come in the form of a commercial setting. *See Id.* at 33 (discussing Maine's anti-dilution statute). In *L.L. Bean,* the First Circuit held that a sexually-oriented parody of L.L. Bean's catalog in a commercial adult-oriented magazine was noncommercial use of the trademark. *See Id.* The court stated:

> If the anti-dilution statute were construed as permitting a trademark owner to enjoin the use of his mark in a noncommercial context found to be negative or offensive, then a corporation could shield itself from criticism by forbidding the use of its name in commentaries critical of its conduct. The legitimate aim of the anti-dilution statute is to prohibit the unauthorized use of another's trademark in order to market incompatible products or services. The Constitution does not, however, permit the range of the anti-dilution statute to encompass the unauthorized use of a trademark in a noncommercial setting such as an editorial or artistic context.

*Id.*

Here, Bally wants to protect its valuable marks and ensure that they are not tarnished or otherwise diluted. This is an understandable goal. However, for the reasons set forth above, Faber's "Bally sucks" site is not a commercial use.

Even if Faber's use of Bally's mark is a commercial use, Bally also cannot show tarnishment. Bally cites several cases such as the "Enjoy Cocaine" and "Mutant of Omaha" cases for the proposition that this site and its relationship to other sites tarnishes their mark. *See Mutual of Omaha Ins. Co. v. Novak,* 648 F.Supp. 905 (D.Neb.1986) (discussing both infringement and disparagement), *aff'd* 836 F.2d 397 (8th Cir.1987) (addressing infringement, but not disparagement); *Coca–Cola v. Gemini Rising, Inc.,* 346 F.Supp. 1183 (E.D.N.Y.1972).

There are, however, two flaws with Bally's argument. First, none of the cases that Bally cites involve consumer commentary. In *Coca–Cola,* the court enjoined the defendant's publication of a poster stating "Enjoy Cocaine" in the same script as Coca–Cola's trademark. *See Coca–Cola,* 346 F.Supp. at 1192. Likewise, in *Mutual of Omaha,* the court prohibited the use of the words "Mutual of Omaha," with a picture of an emaciated human head resembling the Mutual of Omaha's logo on a variety of products as a means of protesting the arms race. *See Mutual of Omaha,* 836 F.2d at 398. Here, however, Faber is using Bally's mark in the context of a consumer commentary to say that Bally engages in business practices which Faber finds distasteful or unsatisfactory. This is speech protected by the First Amendment. *See L.L. Bean,* 811 F.2d at 29; McCarthy, § 24:105 at 24–191. As such, Faber can use Bally's mark to identify the source of the goods or services of which he is complaining. This use is necessary to maintain broad opportunities for expression. *See* Restatement (Third) of Unfair Competition § 25(2), cmt. i (1995) (stating "extension of the antidilution statutes to protect against damaging nontrademark uses raises substantial free speech issues and duplicates other potential

remedies better suited to balance the relevant interests").

The second problem with Bally's argument is that it is too broad in scope. Bally argues that the proximity of Faber's "Images of Men" site tarnishes the good will that Bally's mark enjoys because it improperly creates an association between Bally's mark and pornography. If the Court accepted this argument it would be an impossible task to determine dilution on the Internet. It is true that both sites are under the same domain name, "Compupix.com." Furthermore, it is also true that at a variety of times there were links between Faber's various sites. However, at no time was any pornographic material contained on Faber's "Bally sucks" site. From its inception, this site was devoted to consumer commentary. Looking beyond the "Bally sucks" site to other sites within the domain or to other linked sites would, to an extent, include the Internet in its entirety. The essence of the Internet is that sites are connected to facilitate access to information. Including linked sites as grounds for finding commercial use or dilution would extend the statute far beyond its intended purpose of protecting trademark owners from use that have the effect of "lessening . . . the capacity of a famous mark to identify and distinguish goods or services." 15 U.S.C. § 1127. Further, it is not logical that a reasonably prudent Internet user would believe that sites which contains no reference to a trademark and which are linked to, or within the same domain as, a site that is clearly not sponsored by the trademark owner are in some way sponsored by the trademark owner.

Therefore, the Court grants Faber's motion for summary judgment on the claim of trademark dilution.

### D. *Unfair Competition*

Bally relies on the claims of trademark dilution and trademark infringement to establish its claim of unfair competition. Because Faber has shown that he is entitled to summary judgment on the trademark infringement and dilution claims, the Court grants Faber's motion for summary judgment on the unfair competition claim as well.

### II. Faber's motion for attorney's fees

In Faber's reply to Bally's opposition he raises the claim that he is entitled to attorney's fees under the Lanham Act because the plaintiff's claims have no substance. Because Faber did not include this argument in his motion, the Court declines to address this issue because Bally has not had an opportunity to respond.

### III. Conclusion

The explosion of the Internet is not without its growing pains. It is an efficient means for business to disseminate information, but it also affords critics of those businesses an equally efficient means of disseminating commentary. Here, trademark infringement and trademark dilution do not provide a remedy for Bally.

The Court GRANTS Faber's motion for summary judgment on the claims of trademark infringement, trademark dilution, and unfair competition.