FAEGRE & BENSON, LLP, Felicia J. Boyd, and John H. Hinderaker, Plaintiffs,

v.

William S. PURDY, Sr., Please Don't Kill Your Baby, and Does 1–10, Defendants.

No. CIV. 03–6472MJDJGL.

United States District Court, D. Minnesota.

April 27, 2005.

John P. Borger, Felicia J. Boyd, Molly K. Beutz, Faegre & Benson LLP, Minneapolis, MN, for Plaintiffs.

Douglas Brian Altman, Altman & Izek, Minneapolis, MN, for William S. Purdy, Sr., for purposes of the contempt hearing.

## MEMORANDUM OF LAW & ORDER

DAVIS, District Judge.

## I. INTRODUCTION

This matter is before the Court on Plaintiffs' Motion for Order to Show Cause and for Clarification of Injunction. [Docket No. 91] Defendant William Purdy also filed a third motion requesting recusal of Judge Michael Davis. [Docket No. 111] The Court heard oral argument on March 7, 2005.

## II. FACTUAL BACKGROUND

### A. Procedural Background

Plaintiffs Faegre & Benson, LLP ("Faegre"), Felicia Boyd, and John H. Hinderaker filed a complaint against William S. Purdy, Sr., Please Don't KILL Your Baby ("PDKYB"), and Does 1–10, on December 15, 2003, alleging that Defendants registered numerous internet domain names that are confusingly similar to Faegre's protected mark and that statements on the web sites were defamatory.

On January 5, 2004, the Court issued an order granting Plaintiffs' motion for a preliminary injunction and for a temporary restraining order ("January 5 Order"). The January 5 Order applied to Purdy and stated, in relevant part:

2. Defendants and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order are also preliminarily enjoined from registering or using any domain name that both (1) incorporates, and is identical or confusingly similar to, Faegre's distinctive and protected marks FAEGRE & BENSON, FAEGRE, FAEGRE.COM or FAEGRE & BENSON LLP or any other marks identical or confusingly similar to any marks used or owned by Faegre, and (2) does not alert the Internet user to the protest or critical commentary nature of the attached web site within the language of the domain name itself.

\* \* \* \* \* \*

5. Defendants and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order are also preliminarily enjoined from using any trademark that is identical or confusingly similar to Faegre's distinctive and protected

marks FAEGRE & BENSON, FAEGRE, FAEGRE & BENSON LLP, and FAEGRE.COM, or any other mark used or owned by Faegre.

6. All Defendants and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order are temporarily and preliminarily prohibited and enjoined from displaying any web site, the appearance of which is identical or confusingly similar to the trade dress of Faegre's web site at faegre.com.

\* \* \* \* \* \*

11. All Defendants and their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Order are ordered to cease illegal appropriation of the names of the Plaintiffs and all individuals associated or affiliated with the Plaintiffs.

Purdy filed an appeal of the January 5 Order with the Eighth Circuit Court of Appeals, and the Eighth Circuit affirmed that Order on April 4, 2005.

On September 1, 2004, the Eighth Circuit issued an opinion affirming a similar injunction against Purdy in the case of *Coca-Cola Co. v. Purdy*, 382 F.3d 774 (8th Cir.2004). On September 2, 2004, this Court issued an Order ("September Contempt Order"), based on Plaintiffs' first motion for contempt, finding Purdy in contempt of its January 5 Order for 1) failing to transfer ownership of three domain names specifically addressed in the January 5 Order; 2) registering and using a number of domain names that were identical or confusingly similar to Faegre's trademarks in violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) ("ACPA"); and 3) illegally appropriating Plaintiff Felicia Boyd's name. [Docket No. 86] Purdy appealed the Court's September Contempt Order,

and the Eighth Circuit dismissed Purdy's appeal on November 23, 2004.

On November 16, 2004, Plaintiffs filed this second motion for contempt.

**B. Trade Dress**

Beginning in March 2004, and continuing until at least February 16, 2005, Purdy has posted a web page at johnkerryspeaks.com that contains portions of Faegre's trade dress. Exh. 60 to Fourth Beutz Decl. (web page as of March 2004); Exh. 68 to Fifth Beutz Decl. (web page as of April 2004); Exh. 96 to Seventh Beutz Decl. (web page as of November 2004); Exh. 126 to Eighth Beutz Decl. (web page as of February 2005). Plaintiffs refer to this web page as "Counterfeit Faegre Page 1." The web page contains large, graphic photographs that purport to show aborted fetuses. The main text on the page discusses Purdy's opinion that Faegre is attempting to silence his speech criticizing its alleged support of abortion. In the upper-left-hand corner of the web page, below the name "Faegre & Benson LLP," is the disclaimer "Critical Satire Parody Page."

In September 2004, Purdy posted an altered version of Faegre's redesigned web page at pleas edontkillyour baby. com/faegre- benson-law-firm- blood-drip-ping.htm and at thedemocraticnational comm ittee.com/ officialfaegre- bensonla- woffice website.htm. Plaintiffs refers to this web page as "Counterfeit Faegre Page 2." Exh. 97 to Seventh Beutz Decl. (web page as of November 2004). The domain name faegre-law-love- democraticjudges michaeldavis-judge annmontgomery.com, which is registered to PDKYB, also directs users to Counterfeit Faegre Page 2. Seventh Beutz Decl. ¶ 4; Exh. 98 to Seventh Beutz Decl.; Exh. 121 to Eighth Beutz Decl. (web page as of February 2005). Counterfeit Faegre Page 2 also

contains copying of Faegre's trade dress. In the upper-left-hand corner, under the name "faegre.com," is the phrase "Official Faegre Parody Website." Prominently displayed at the top and center of the web page are graphic pictures that purport to show aborted fetuses. The main text on the page discusses Purdy's opinion that Faegre & Benson is attempting to silence his speech criticizing its alleged support of abortion.

Purdy also posted a third iteration of an altered faegre.com web page at pleasedontkillyour ba by.com/faegre- benson-law-firm -blood-dripping.htm, which Plaintiffs refer to as "Counterfeit Faegre Page 3." *See* Exhs. 101–05 to Seventh Beutz Decl. (web page as of September 2004 through November 2004). Counterfeit Faegre Page 3 also appears at other domain names, such as pleasedontkill yourba-by.com. *See* Seventh Beutz Decl. ¶ 12; Exhs. 123, 125, 127 to the Eighth Beutz Declaration (multiple versions of web page as of February 2005). Counterfeit Faegre Page 3 contains copying of Faegre's trade dress and is dominated by a large graphic photograph purporting to show a dismembered fetus. In the upper-left-hand corner of the web page, below the name "faegre.com" is the phrase "Official Faegre Website Parody." As on the previous two web pages, the main text on the page discusses Purdy's opinion that Faegre & Benson is supporting abortion and is attempting to silence his speech criticizing its alleged support of abortion.

### C. Infringing Domain Names

Purdy has posted web pages at the following four domain names, all of which Faegre alleges violate the ACPA: faegre-benson- tencommandments.com, faegre-benson-vote forpresidentbush.com, john-faegre-kerry. com, and faegre-law-love-democraticjudges michaeldavis- judgeann-montgomery. com. In its September Contempt Order, the Court specifically or-dered Purdy to cease using the first three of these domain names. Sept. 2 Contempt Order at 14–15. [Docket No. 86] On January 20, 2005, Purdy ceased to post content at the first three web sites. Eighth Beutz Decl. ¶ 4; Purdy Decl. ¶ 3; Exh. 120 to Eighth Beutz Decl.

### D. Metatags

The source code of Purdy's Counterfeit Faegre Pages 2 and 3 contain metatags from faegre.com, including the trade-marked terms "Faegre & Benson" and "Faegre and Benson," and some meta-descriptions taken from Faegre's web page. *See generally* Fifth Scoville Decl. [Docket No. 97]

> A 'meta tag' is a list of words normally hidden in a web site that acts as an index or reference source identifying the content of the web site for search engines. This has been analogized to the subject index of a card catalog indicating the general subject of a book.

4 *McCarthy on Trademarks & Unfair Competition* § 25:69 (4th ed.) (footnote omitted). Internet search engines use a variety of factors to rank web pages, including metatags. *Id.*

Due in part to Purdy's extensive use of Faegre's metatags and the content of the faegre.com web page, certain internet search engines, such as Yahoo, prominently display his web sites in results generated in response to queries that include Faegre's trademarks. *See* Exh. 11 to Fifth Scoville Decl.; Fifth Scoville Decl. ¶¶ 23–26. Purdy's web pages do not appear as prominent responses to queries in other search engines, such as Google. Altman Aff. ¶ 2. Because Purdy uses the description tags from faegre.com, on some search engines that display the description tags, the description of Purdy's web page includes portions of the description of

Faegre's website. *See* Exh. 10 to Fifth Scoville Decl.

### E. John Hinderaker

Plaintiff John Hinderaker publishes a popular internet blog—or web log—entitled "Power Line," located at powerlineblog.com, under the pseudonym "Hindrocket." Hinderaker Decl. ¶ 5. On September 13, 2004, a statement appeared on the discussion board on pleasedontkill yourbaby.com/ Discussion that purported to be by Hinderaker. Exh. 107 to Seventh Beutz Decl. Hinderaker did not create or authorize use of the posting attributed to his name. Hinderaker Decl. ¶ 3.

On November 6, 2004, Purdy registered the domain name "hindrocket.com" and directed that domain name to a web page proclaiming to be the "Official John Hinderaker Site." Exhs. 108–09 to Seventh Beutz Decl.; Exh. 122 to Eighth Beutz Decl. The web page contains criticism of Hinderaker related to his alleged stance on abortion.

## III. DISCUSSION

### A. Motion for Recusal

■ On March 4, 2005, Purdy filed his third Motion for Recusal of Judge Michael J. Davis. [Docket No. 111] He argues that this Court should recuse itself because language within the Court's March 18, 2004, Order [Docket No. 50] demonstrates a bias against Purdy, and because the web sites at issue in this current contempt motion are highly critical of this Court, including the language within one of the domain names. The Court rejected these same arguments in its April 26, 2004 Order denying Purdy's second motion for recusal. [Docket No. 71] The Court reasoned that the language in the March 18 Order did not indicate that the Court was biased against Purdy. It also concluded that it would not disqualify itself based on any criticism posted by Purdy after the com-

mencement of the current litigation. As orally ordered on March 7, 2005, and based on the reasoning of the Court's April 26 Order, Purdy's third motion for recusal is denied.

### B. Contempt Standard

■ In a civil contempt proceeding, the moving party must prove, by clear and convincing evidence, that the person allegedly in contempt violated the court's order. *Chicago Truck Drivers v. Bhd. Labor Leasing,* 207 F.3d 500, 505 (8th Cir.2000). However, the moving party does not need to show that the violation of the court's order was willful. *McComb v. Jacksonville Paper Co.,* 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1949); *Ford Motor Co. v. B & H Supply, Inc.,* 646 F.Supp. 975, 1002 (D.Minn.1986), *opinion supplemented by* No. Civ. 3–85–865, 1987 WL 59519 (D.Minn. April 13, 1987).

■ Once the moving party has met its burden, the burden shifts to the nonmoving party to show inability to comply. *Chicago Truck Drivers,* 207 F.3d at 505. To demonstrate inability to comply, the nonmoving party must establish "(1) that they were unable to comply, explaining why categorically and in detail, (2) that their inability to comply was not self-induced, and (3) that they made in good faith all reasonable efforts to comply." *United States v. Santee Sioux Tribe of Neb.,* 254 F.3d 728, 736 (8th Cir.2001) (citation omitted).

■ "Civil contempt may be employed either to coerce the defendant into compliance with a court order or to compensate the complainant for losses sustained, or both." *Chicago Truck Drivers,* 207 F.3d at 505. The Court may levy a fine against the party in contempt, which is payable to the moving party or to the Court, or may order imprisonment. *Id.* The Court may also award attorney's fees

and other costs incurred in prosecuting the contempt motion to the moving party. *See Kehm v. Procter & Gamble Mfg. Co.*, 724 F.2d 630, 630–31 (8th Cir.1984) (per curium) (affirming award of $10,000 in attorney's fees for litigating contempt motion).

### C. Trade Dress Infringement

Plaintiffs argue that Purdy's Counterfeit Faegre Pages 1, 2, and 3 are confusingly similar to Faegre's web site at faegre.com, in violation of Paragraph 6 of the January 5 Order, because they infringe on Faegre's trade dress. Paragraph 6 enjoins Purdy from "displaying any web site, the appearance of which is identical or confusingly similar to the trade dress of Faegre's web site at faegre.com."

Plaintiffs note that the counterfeit web pages feature the same color scheme, layout, buttons, fonts, and graphics as faegre.com. They argue that the overall impression created by Purdy's web pages is dominated by the substantial incorporation of Faegre's home page. Purdy responds that his web pages are parodies and that they prominently display parody disclaimers. He asserts that the large pictures purporting to show dismembered fetuses are not the type of picture that would appear on Faegre's official web site and, thus, are unlikely to confuse the internet user.

Trade dress is entitled to protection under the Lanham Act if: "(1) it is inherently distinctive or has acquired distinctiveness through secondary meaning; (2) it is primarily nonfunctional; and (3) its imitation would result in a likelihood of confusion in consumers' minds as to the source of the product." *Insty\*Bit, Inc. v. Poly–Tech Indus., Inc.*, 95 F.3d 663, 667 (8th Cir.1996). "Trade dress is the total image of a product, the overall impression created, not the individual features." *Gateway, Inc. v. Companion Prods., Inc.*, 384 F.3d 503, 507 (8th Cir.2004).

A parody does not receive absolute protection from trademark law; however, "a parody contained in an obvious editorial context is less likely to confuse, and thus [is] more deserving of protection than [trade dress and trademarks] displayed on a product." *Anheuser–Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 776 (8th Cir.1994). Although the Lanham Act does not require that a parody carry a disclaimer, the fact that the parody carries a label stating "satire" or "parody" "should alert most consumers" that the item is a parody. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publ'g Group, Inc.*, 886 F.2d 490, 496 (2d Cir.1989). *See also Anheuser–Busch, Inc.*, 28 F.3d at 776–77 (holding that ad parody violated Lanham Act, but that "by using an obvious disclaimer" defendant could have substantially lessened risk of consumer confusion).

When determining the likelihood of confusion, the Court considers "(1) the strength of the owner's mark; (2) the similarity between the owner's mark and the alleged infringer's mark; (3) the degree to which the products compete with each other; (4) the alleged infringer's intent to 'pass off' its goods as those of the owner; (5) incidents of actual confusion; and (6) the type of product, its costs, and conditions of purchase." *Insty\*Bit, Inc. v. Poly–Tech Indus., Inc.*, 95 F.3d 663, 667 (8th Cir.1996). The parties do not dispute the strength of Faegre's mark, and the "the type of product, its costs, and conditions of purchase" factor is not applicable in this case. Purdy's web sites do not offer legal services in competition with Faegre, and Plaintiffs have not offered admissible, clear evidence of actual confusion. Although Purdy has used domain names that are confusingly similar to Faegre's marks, thus indicating an intent to mislead internet users, the web sites at issue in this trade dress claim do not pos-

sess domain names that are confusingly similar to Faegre's marks. Additionally, Purdy's inclusion of a parody disclaimer weighs against a finding that he intends to pass off his web pages as affiliated with Faegre.

The most substantial factor in this case is the extent of the similarity between Faegre's trade dress and the appearance of Purdy's web pages. Although the web sites at issue do contain exact copies of portions of Faegre's trade dress, their overall dissimilarity from Faegre's page creates a low likelihood of confusion. Purdy's web pages are dominated by graphic photographs purporting to show aborted fetuses, which are not similar to or related to any content or design on Faegre's official web page, or to the content or design that a consumer would be likely to expect to find on a law firm web site. Much of the text of Purdy's web pages consists of clear criticism of Faegre's alleged position on abortion and on its actions in this litigation. This critical text is not similar to the text found on Faegre's web page or to the type of text a consumer would be likely to think was sponsored by Faegre. Finally, each web page contains a clear parody disclaimer stating "Critical Faegre Website Parody" or "Official Faegre Parody Website." These disclaimers, combined with the prominent photographs that are jarringly unlike anything that a consumer would expect on an official law firm web page, should alert the consumer that the web pages are parodies; thus, they are less likely to confuse consumers as to the sponsorship, affiliation, or source of Purdy's web pages. "The ultimate inquiry always is whether, considering all the circumstances, a likelihood exists that consumers will be confused about the source of the allegedly infringing product." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999).

Because Purdy's web sites are not likely to cause confusion among consumers, the Court determines that his use of Faegre's trade dress does not constitute trade dress infringement and is not in violation of the Court's Order.

## D. Cybersquatting

Plaintiffs assert that Purdy violated Paragraph 2 of the January 5 Order by controlling and posting web pages at the following four domain names: faegre-benson- tencommandments.com, faegre-benson-vote forpresidentbush. com, johnfaegre-kerry. com, and faegre-law-love- democraticjudge smichaeldavis- judgeannmontgomery .com. The Court specifically ordered Purdy to cease using the first three of these domain names in its September Contempt Order, on the grounds that those three names were confusingly similar to Faegre's protected mark. Plaintiffs assert that the fourth domain name is also confusingly similar to its mark and does not alert internet users to the protest or critical commentary nature of the attached web site within the language of the domain name itself.

 Purdy asserts that he has attempted to comply with the Court's Order, but Gandi, the registrar, would not allow him to direct the three explicitly prohibited domain names to an error page. Purdy Decl. ¶ 3. The Court already determined that Purdy has the ability to control the three explicitly prohibited domain names, Sept. 2 Contempt Order at 18 [Docket No. 86], and Purdy has provided no new evidence to convince the Court that he has lost the ability to control the use of those names. Although the three domain names no longer direct the internet user to any content, by continuing to display content on those pages after the Court's explicit instruction that he cease to do so, Purdy was clearly in violation of the Court's Jan-

uary 5 Order and September Contempt Order. Because he ceased to display content at those domain names on January 20, 2005, the Court finds that Purdy was in contempt of the Court's Orders from the date of the first Contempt Order, September 2, 2004, through January 19, 2005, for a total of 139 days.

▮ The Court determines that Purdy is not in contempt for his use of the domain name faegre-law-l ove-democraticjudgesmichaeldavis-judgeannmontgomery.com, which was not specifically prohibited by the Court's prior Orders and is not identical nor confusingly similar to Plaintiffs' marks. This domain name constitutes a statement of Purdy's opinion regarding the relationship between Faegre and Judge Montgomery and Judge Davis rather than a bad faith intent to profit from Faegre's protected mark. 15 U.S.C. § 1125(d). Purdy has the right to use "expressive domain names that are unlikely to cause confusion." *Coca–Cola Co. v. Purdy*, 382 F.3d 774, 787 (8th Cir.2004). The Court concludes that a reasonable internet user would not think that a law firm would use or approve of a domain name stating its "love" of two federal judges.

### E. Metatags

▮ Plaintiffs assert that Purdy's use of Faegre's trademarks in the metatags for his web pages violates Paragraph 5 of the Court's January 5 Order, but request clarification of that Order in order to alleviate any possible ambiguity. *See PACCAR Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 258 (6th Cir.2003) (holding that district court must separately analyze whether use of "metatags alone, without the inclusion of those marks in the domain names, creates a likelihood of confusion").

Paragraph 5 enjoined Purdy "from using any trademark that is identical or confusingly similar to Faegre's distinctive and protected marks FAEGRE & BENSON, FAEGRE, FAEGRE & BENSON LLP, and FAEGRE.COM, or any other mark used or owned by Faegre." In order to show trademark infringement under the Lanham Act, Plaintiffs must show that they have a mark entitled to protection and that Purdy's use of the mark is likely to confuse consumers as to the source of Purdy's product or services. 15 U.S.C. § 1125(a); *Everest Capital Ltd. v. Everest Funds Mgmt., L.L.C.*, 393 F.3d 755, 759 (8th Cir.2005).

Plaintiffs assert that use of a competitor's trademark in a web page's metatags with the purpose of diverting internet users from their intended web site destination constitutes trademark infringement under the Lanham Act. *See Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1062–66 (9th Cir.1999). They claim that search engines are likely to list Purdy's web pages when an internet user does a search using Faegre's trademarks. Thus, Plaintiffs assert, Purdy misdirects search engines to his web pages, causing his pages to be prominently listed among the search results. According to Plaintiffs, although the user may eventually discover that the web pages do not belong to Faegre, by that time, Purdy will have diverted internet traffic to his web pages. Additionally, because Purdy uses Faegre's meta-description tags, some search engines may list a summary description of his web sites that appears nearly identical to the summary of Faegre's actual web site.

Purdy responds that his use of Faegre's trademarks is a fair use of those marks in order to identify the content of his website, which does criticize Faegre. A defendant's use of a trademark in metatags in a descriptive manner can constitute a noninfringing fair use. *Brookfield Communications, Inc.*, 174 F.3d at 1066; *see also* 15

U.S.C. § 1115(b)(4) (codifying fair use defense, when "the use of the name ... is a use, otherwise than as a mark ... of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party").

Purdy cannot be entirely barred from using Faegre's trademarks in his metatags. Purdy's web sites do contain content related to his criticism of Faegre. Thus, he may legitimately use Faegre's trademarks in his metatags in order to refer to Faegre and to describe the content of his website. *Brookfield Communications, Inc.*, 174 F.3d at 1066; *Bihari v. Gross*, 119 F.Supp.2d 309, 322–23 (S.D.N.Y.2000). If the Court enjoined Purdy from using the term "Faegre & Benson" in his metatags, to the extent that search engines do use metatags to catalog web sites, the Court would bar Purdy from communicating his criticism of Faegre on the internet. *Bihari*, 119 F.Supp.2d at 323; *Bally Total Fitness Holding Corp. v. Faber*, 29 F.Supp.2d 1161, 1165 (C.D.Cal.1998). Even if Purdy is criticizing Faegre in a distasteful manner, he has the right to catalog his website. *Bihari*, 119 F.Supp.2d at 323–24.

Based on the fair use defense under the Lanham Act, Purdy can legally use Faegre's marks in his metatags in the descriptive sense, particularly if he employs a disclaimer on his web pages; however, he is not permitted to use Faegre's marks in his metatags in order to divert internet users from Faegre's web site. Purdy's wholesale copying of some of Faegre's description tags indicates an intent to mislead the internet user rather than merely to categorize critical web pages.

Because the Court's Preliminary Injunction did not specifically address metatag use, the Court will not find Purdy in contempt based on these actions. Instead, the Court now clarifies its Preliminary Injunction to enjoin Purdy from future metatag use in violation of the Lanham Act. Purdy is not completely barred from use of Faegre's trademarks in the metatags of his web site. Instead, Purdy may only use Faegre's trademarks in the metatags for his web sites to the extent that he is, in good faith, describing the content of his website. Examples of the types of actions that would be indicative of bad faith include wholesale copying of Faegre's meta-description tags or HTML code, use of Faegre's marks in metatags attached to a site with a confusingly similar domain name, and use of Faegre's marks beyond what is necessary to accurately describe the contents of Purdy's web site.

### F. Appropriation

Plaintiffs next contend that Purdy has violated Paragraph 11 of the January 5 Order, which requires him "to cease illegal appropriation of the names of Plaintiffs and all individuals associated or affiliated with the Plaintiffs," by posting statements falsely attributed to Hinderaker and by publishing the "Official John Hinderaker Site" under the domain name hindrocket.com.

"Appropriation protects an individual's identity and is committed when one 'appropriates to his own use or benefit the name or likeness of another.' " *Lake v. Wal–Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn.1998) (footnote omitted). "To tortiously appropriate an individual's name, one must appropriate for the *purpose* of taking advantage of that individual's name, or reputation." *Kovatovich v. K–Mart Corp.*, 88 F.Supp.2d 975, 986–87 (D.Minn.1999).

The Minnesota Supreme Court cited the Restatement (Second) of Torts § 652C when recognizing the tort of appropriation. The Restatement notes that appropriation

applies "when the defendant makes use of the plaintiff's name or likeness for his own purposes and benefit, even though the use is not a commercial one, and even though the benefit sought to be obtained in not a pecuniary one." Restatement (Second) of Torts § 652C, cmt. b. *See also Felsher v. Univ. of Evansville,* 755 N.E.2d 589, 600 (Ind.2001) (finding appropriation when defendant used plaintiffs' names in e-mail addresses and web sites and holding that defendant misappropriated plaintiffs' names to his "advantage in that [the misappropriation] enabled him to pursue a personal vendetta"). The Court has previously found Purdy in contempt for using the domain name feliciaboyd.info.

■ In this case, Purdy has published a web page at the domain name hindrocket.com, which bears the title "Official John Hinderaker Site." According to the evidence before the Court, Hinderaker is well-known by his blog pseudonym, Hindrocket, and an associated rocket graphic. An internet user might search for the pseudonym in a search engine or type hindrocket.com in a web browser, and end up at Purdy's web page, entitled "Official John Hinderaker Site," which features Hinderaker's photograph, the rocket graphic, and the inclusion of an altered biography of Hinderaker, all of which contribute to the impression that Hinderaker sponsored or is affiliated with the page. Purdy's actions are a deliberate attempt to take advantage of Hinderaker's goodwill, reputation, and prestige in order to divert traffic to Purdy's web page and to generate publicity.

Purdy argues that "hindrocket" is not a mark owned or used by Faegre and that he cannot be liable for appropriating a pseudonym. As long as a pseudonym clearly identifies the plaintiff, it is protected from appropriation. *See, e.g., McFarland v. Miller,* 14 F.3d 912, 922 (3d Cir. 1994) (holding New Jersey law prohibits appropriation of a celebrity's nickname); *Ackerman v. Ferry,* No. B143751, 2002 WL 31506931, at *18–19 (Cal.Ct.App. Nov. 12, 2002) (unpublished) (holding that California's appropriation statute covered appropriation of pseudonyms because "[n]icknames and pen names are names"); *Hirsch v. S.C. Johnson & Son, Inc.,* 90 Wis.2d 379, 280 N.W.2d 129, 137 (1979) (holding that plaintiff stated a prima facie case for common law appropriation of his well known nickname, Crazylegs, because "[a]ll that is required is that the name clearly identify the wronged person"). The evidence before the Court supports a finding that the public associates Hinderaker with his pseudonym, Hindrocket.

Purdy also argues that the web page currently associated with "hindrocket.com" features prominent disclaimers such as "Official site to criticize Attorney John Hinderaker," "Parody Website," and "Critical Website." Altman Aff. ¶ 3; Exh. 122 to Eighth Beutz Decl. (showing the web page as of November 2004, without disclaimers, and February 2005, with the disclaimers). Although Purdy's disclaimers may alleviate confusion once an internet user has reached the content of the web site, by employing "hindrocket.com" as his domain name, Purdy appropriated Hinderaker's name for his own purposes and benefit—to mislead internet users into visiting Purdy's web site when they are actually seeking Hinderaker's web site. Even if an internet user eventually realizes that Purdy's site is not sponsored by Hinderaker, Purdy will have already gained the benefit of luring the user to his web site by exploiting Hinderaker's name. Thus, the Court concludes that Purdy is in contempt of the Court's Orders because he has misappropriated Hinderaker's name.

■ Plaintiffs also assert that Purdy is in contempt because statements falsely attributed to Hinderaker appeared on a dis-

cussion board on a web site controlled by Purdy. These statements created the impression that Hinderaker supports Purdy's actions. Purdy asserts that he does not know who posts messages on his message boards and that Plaintiffs cannot prove who posted the Hinderaker comment.

The Court concludes that Plaintiffs have not shown, by clear and convincing evidence, that Purdy posted the Hinderaker statements on his bulletin board. Under the Communications Decency Act, "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The statute further provides, "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." § 230(e)(3). An "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." § 230(f)(2).

Defendants, like Purdy, who run web sites on which internet users can post comments, are providers of interactive computer services. *See, e.g., Donato v. Moldow,* 374 N.J.Super. 475, 865 A.2d 711, 713 (2005) (holding that, under the Communications Decency Act, "operator of an electronic community bulletin board website" was immune from liability for "allegedly actionable messages posted anonymously by others"); *Schneider v. Amazon.com, Inc.,* 108 Wash.App. 454, 31 P.3d 37, 41 (2001) (holding that Amazon.com was immune from liability for negative comments posted on its web site because, as an interactive web site operator, it was a provider of interactive computer services and, al-

though it could edit postings, it was not an information content provider). Thus, Purdy is immune from defamation or appropriation claims based on content posted by someone else on the bulletin board that he merely hosts. Because Plaintiffs have not shown that Purdy himself posted the Hinderaker statements that appeared on his bulletin board, the Court will not hold Purdy in contempt for merely hosting the bulletin board on which the offending statements appeared.

### G. Sanctions

■■■■ Plaintiffs have met their burden of showing clear and convincing evidence that Purdy has violated the Court's Orders by controlling and posting web pages at the following three domain names: faegre-benson- tencommandments. com, faegre-benson-vote forpresidentbush.com, and john-faegre-kerry.com, from September 2, 2004, through January 19, 2005. Plaintiffs have also shown, by clear and convincing evidence, that Purdy violated the Court's Orders by appropriating Hinderaker's name through his registration and use of the domain name hindrocket.com.

The Court also concludes that Purdy has not demonstrated his inability to comply with the Court's Orders. The domain names at issue are registered to Purdy or to an entity that he controls. Additionally, he has continued to make alterations to his existing web pages after the Court found him in contempt on September 2, 2004.

As set forth in the Court's September 2, 2004, Order, based on his use of the prohibited domain names faegre-benson- tencommandments .com, faegre-benson-vote forpresidentbush. com, and john-faegre-kerry.com, Purdy is liable for sanctions of $500 per day from the date of the September 2, 2004, Contempt Order until the date that he ceased to be in violation of that Order and the January 5 Order, January

19, 2005. Thus, Purdy is liable to Plaintiffs for a fine of $500 per day for 139 days of contempt, for a total of $69,500.

The Court has also found that Purdy is in contempt for his use of the domain name hindrocket.com. For each day after the date of this Order that Purdy continues to violate the Court's Orders through his use of this domain name, Purdy will be liable for a fine of $500 per day, payable to Plaintiffs. In order to ensure Purdy's compliance with this Order, Purdy is required to pay any sanctions incurred in the future to Plaintiffs, through their counsel, on the last day of each month as each sum accrues, until his contempt is purged. Additionally, the Court will award Plaintiffs their reasonable costs and attorney fees spent in bringing this motion.

Based on the record in this matter and on this Memorandum of Law and Order, which constitutes the Court's findings of fact and conclusions of law, **IT IS HEREBY ORDERED**:

1. Defendant's Third Motion for Recusal of Judge Michael J. Davis [Docket No. 111] is **DENIED**.

2. Plaintiffs have proven, by clear and convincing evidence, that Defendant William S. Purdy, Sr., violated the Court's January 5, 2004, Order and its September 2, 2004, Order, as detailed in this Memorandum of Law and Order. Thus, Purdy is adjudged in civil contempt of this Court's January 5, 2004, Order and its September 2, 2004, Order, as set forth in this Memorandum of Law and Order.

3. Plaintiff's Motion for Order to Show Cause and for Clarification of Injunction [Docket No. 91] is **GRANTED IN PART** and **DENIED IN PART** as set forth in this Memorandum of Law and Order.

4. Purdy shall pay the accrued contempt fine of sixty-nine thousand five hundred dollars ($69,500), plus thirty-seven thousand one hundred thirty-nine dollars and twenty cents ($37,139.20) in attorney's fees awarded to Plaintiffs in the September Contempt Order, within ten days of the date of this Order.

5. Purdy will continue to be liable for contempt fines of five hundred dollars ($500) per day until he is in full compliance with the terms of the January 5 Order, the September Contempt Order, and this Order.

6. Purdy shall pay to the Plaintiffs, through their counsel, their attorney's fees, costs, and expenses related to the bringing of this contempt motion. Plaintiffs shall submit an itemization of their attorney's fees within fourteen (14) days of the date on which Defendant Purdy pays the $37,139.20 in attorney's fees that were awarded to Plaintiffs in the September Contempt Order. Defendant Purdy will thereafter have seven (7) days to respond to Plaintiffs' fee request.

7. Any such additional sum accrued as a sanction for Purdy's contempt, and any sum accrued as additional attorney's fees awarded to Plaintiffs, pursuant to this Order or any future Order of this Court, will be payable to Plaintiffs, through their Counsel, on the last day of each month as each sum accrues.

8. Purdy shall immediately cease use of the domain name hindrocket.com and shall immediately transfer ownership of this name to Plaintiff Hinderaker.

9. Purdy shall provide a written report to this Court and counsel for the Plaintiffs setting forth in detail his compliance with this Order within ten (10) days from the date of this Order.